We're going to go ahead and take up the next case on the jacket. C.J. Cooper v. Jesse McDonald 516-0483 C.J. Cooper v. Jesse McDonald 516-0483 Your Honors, I'm Assistant Defendant Eli Harris, and I'm appearing on behalf of my client, the Appellant Jesse McDonald. We raise two issues in briefing, but unless the Court directs me otherwise, I'm going to confine my argument to the first issue. May it please the Court. This Court should reverse the Trial Court's erroneous denial of Mr. McDonald's motion to suppress. The police violated the Fourth Amendment by entering on his property without a warrant or valid exception, and that violation invalidated any subsequent consent. So there are two parts to this. One is the entry, the other part is whether any violations was attenuated from consent. The entry itself is pretty straightforward. We know that absent a few exceptions, they're called well-delineated. Some of them are, some of them are not so. Warrantless searches are per se unreasonable. The exception that was alleged here was that there was a knock and talk, which allows police to do anything that any member of the public is welcome to do in regards to entering the property. So the question is whether Mr. McDonald gave implicit license to the public to enter on his property. And the answer is that he did not. The easiest way I think Your Honors can see this is to look at the photographs, and I hope they've been reproduced in the briefs for you in color. They're less so in the black and white. But you're able to see fencing around the property. You're able to see this gate that has a piece of wood leaned against it. You're able to see this gap that was supposedly blocked by wood and wire. And there's a no trespassing sign that's posted on a big tree at the front of the property. And again, you know, there was testimony why I didn't see it, but it was, you know, it was, it's visible in the pictures. And I'm looking at those pictures, and I don't think that's very visible. Okay. Of course, pictures aren't, pictures aren't in person. That's true. The record should have the pictures. The record also has the photographs, yes. So I will say, holding the photographs with my eyes, and like I said, I've got new glasses, you can see it. You know, it may not be the first thing you see when you walk up to the property. The first thing I would notice when I walked up to the property is this fence. Your Honors have to run for elections. I don't know whether you would feel welcome to go up and knock on the door and ask for a vote at this property or not. But I certainly wouldn't. Depends on how big the dog was behind it. Well, there was no testimony. I will say that there was no testimony that the dog was in any way ferocious. They did ask him to, they did supposedly ask him to put the dog away while they were there. But be that as it may, I think the main thing is you just look at the property. You have a house that's set back 60 or 70 yards, or maybe it was 70 or 80 yards from the gate itself. You have to walk up a lane that's not well maintained. Doesn't look like a lot of people are traveling up and down it. And this just doesn't look like a place that welcomes visitors very often. What was the testimony that your client saw them coming on the porch and said, come on in and here's how you open the gate? Well, there was testimony, there were several different pieces of testimony about this. One is that, okay, and most of the contradictions take place in Detective Vincent's testimony. First he says he didn't have to open the gate, the gate was open. Then he says, well, there may have been a gap between, but I don't remember having to move anything. He testified that Mr. McDonald shouted directions to the sheriff who was parked across the street on how to open the gate. The sheriff himself, who presumably was the one who drove through the gate, well, presumably he was the one who drove through the gate, said he didn't remember how the gate got open. He didn't remember whether it was taken off the hinges. He didn't remember whether Mr. McDonald consented to it to be open. And he said that the gate had to be physically moved, but he did not remember how that happened. So you have Detective Vincent who's telling, and I'm not saying that he's lying. I'm just saying that his own testimony about how the gate opened or how he got in was contradictory. The guy who actually drove the car up the lane said he had no memory of how this happened, but the gate had to be moved. Does that answer your question or not? But I believe the person who drove in had been originally parked down the road a little ways. I think he was parked across maybe the police road or something. So he may have not have seen what happened with that gate prior to driving through, correct? Your Honor, I'm going to look, if I can, and get back to you on rebuttal as to whether he was right across the road. My memory is that he was right across the road watching. In fact, I think he said he watched the four of them go up the lane. But don't shoot me if that's wrong. So anyway, that's the part about the entry. The State doesn't make an attenuation argument, but I want to go ahead and talk about it because obviously if there is an illegal arrest, or in this case an illegal entry, according to what we're arguing, then the question becomes is any subsequent fruit of that so far attenuated from the illegal act that it's okay and it's admissible? We follow the Brown factors, which are five-fold, and they're stated different ways. Sometimes they're said that they're four-fold, but the basics are whether marine warnings were given, what was the time span between the illegal entry and the consent, what was the presence of intervening circumstances, what was the purpose of the officer's acts, and what was the flagrancy of the officer's conduct. So in this case, according to Detective Vinson's testimony, he merandized Mr. McDonald as soon as McDonald came out to the porch when he got up to the house, and he merandized him pretty much right there. So that one goes in the State's column. But the second factor is the time span between the illegal entry and the consent. In this case, virtually no time elapsed. They come in. They come up to the porch. He's out on the porch, and there's a merandizing, and he gets consent to search. So that one goes in the defendant's column. I will point out that that's not what Mr. McDonald said happened. What Mr. McDonald said happened is that they told him to put his dog away. He goes in the house and does that. And then when he turns around and looks, they're already in his living room. But going with the what, the police? How did they get in the living room? Did he just put his dog away and just leave the door open? Well, Your Honor, I don't know. I go to one county north of here, and surprisingly, I don't know any of these people. But, I mean, I don't think it's the sheriff in my town went to my church and came and did our D.A.R.E. program and everything else. So I don't know what the circumstances are, whether people could be expected to just walk in. I don't know. You know, I don't. There's no testimony, certainly, that he walked in, locked the door and said, don't move. I'm going to put the dog away, and you stay right where you are. But I also don't. You know, there's no testimony, certainly, that he invited them in from him, I'm talking about. This is his version of events. But they saw the plants before they ever really knocked the dog, didn't they? They saw the plants outside the curvilege of his home. That's not what he was convicted of. So if this gets reversed and remanded, what happens on remand is up to, I guess, the state's attorney. The basis for them coming up to his door was they saw these plants. Well, there's no question they had probable cause, I don't think. The question is whether they had a warrant. I understand. But we have decided the curvilege case where they were on the front porch and whether or not they needed a warrant to go much further. So, I mean, the probable cause and the knock and talk, then it comes down to the entry issue, right? Did they need a warrant? Did they not? Was there consent? Was there not consent? Well, I think, yes, obviously there has to be a consent to get in the house. Right. What evidence of consent was there, though? Well, their evidence was that he consented. I mean, usually, you know, you go up to a porch and a screen door or something and they go put the dog away and the screen door closes. So I'm wondering how they ever got in the house. Well, according to the detective, he invited them into the house. So that's the police version of events. But then going right back to that question of what you said earlier, those were factual determinations that the trial court made after hearing all the evidence, both sides. That's correct, Your Honor. And that's why our argument really depends on – No, go right ahead. Okay. We're relying on the detective's version of the events. I'm not arguing that what Mr. McDonald said happened is what happened. I'm saying even if what Vincent says happened, happened, that consent that he says he obtained was invalid because the entry's taint was not attenuated by the time they got to that consent almost immediately. I'll be back unless Your Honor's have further questions. That's a good one. I'll be back. Okay. Mr. Miller? May it please the Court, counsel. My name's Max Miller, and I represent the people of the state of Illinois. This court should affirm the trial court's denial of the defendant's motion to suppress for two main reasons. First, that the knock and talk was lawful. And second, that the issue of the trial court finding consent was finding a fact that was not against the manifest way of the evidence. Concerning knock and talks, the case law says that we need to look at whether the officer's actions were reasonable considering the totality of the circumstances surrounding it. And I think the state and the defense agree there is a bit of a lagging in case law in specific factual scenarios that are quite like this. But why the state would maintain that this was reasonable is first, the state of this fence. This is a makeshift fence. It's made of different parts. Parts of it's wire. Part of it is wood and metal. The gate itself is changed somehow. And he doesn't have a car. He doesn't use the gate. He testifies that he gets in and out by this entranceway next to the gate, which is adjacent to the driveway. The fact that it's made of all different kinds of things, why is it any less of a fence than a fence that's manufactured in total? I would say it's any less of a fence, but it's less clear where the entrance to the fence is. Well, you know, our border wall is like that. On the southern border of the United States, that's still a wall. I mean, we have rocks. We have big, you know, fencing, and then we have small fencing. I mean, I'm not sure I follow your argument there. Sure, Your Honor. I would say that the case law doesn't say that the presence of a fence is in and of itself sufficient to tell the officer that it's not close to the public and the State's argument is that there was a secondary entrance that is separate from this gate that's in the picture that was the actual entrance to this fence. That's what the defendant used and it's what the officers used to get there. And that looking at the circumstances surrounding the fence, there was nothing to inform the officers that that was an improper entrance, especially considering its placement right adjacent to this. There's a gap. The secondary entrance is a gap. Sure. It's a gap and it's sometimes closed with wire and wood, and he removes the wire and wood to leave it open. In this case, it was open. What about this no trespassing sign? And I know that the photo, you can't really tell. It's on this tree, I guess. Absolutely. How far is the tree away from the gate? I believe that we only have it in terms of landmarks. So the tree's about halfway up the driveway from it. But Officer Benson testified that when he approached, he saw no trespassing sign. The state mentioned in its brief that when it reviewed the record's pictures, even in color, it thinks that that's an eminently reasonable thing to say from the gate's position, not five feet from the tree, which is one of the pictures, from the gate, you wouldn't even see a no trespassing sign. There's the branches hanging over it. There's a shadow. And that there's every reason to believe that a reasonable officer did not see it. And that's what Officer Benson testified, and there was nothing that would make us doubt that testimony. The final point I would make about the initial entrance is just that they used the entrance to the property that the defendant used that was left open because the defendant testified that this was an entrance that he closed. He opened and closed, and it was open. And so when the officers came up, they went in, and Officer Benson's testimony, which the defendant calls inconsistent, is at least consistent in one thing. He says, you know, I didn't have to move anything to get up there. I don't remember exactly how he got up there. I know I just walked up to the house. But the second issue of whether or not he consented, because there's the initial entrance to the property, and then there's whether or not they had consent to search his home. And when they walked up to the defendant's home, Officer Benson testified that he smelled the wrong order of cannabis, and he said, can I search, you know, can we search your house? And the defendant said yes. The standard here is whether or not the evidence was such that the trial court's finding was against the manifest way. And the trial court writes in its order, it says, you know, this was clearly a credibility determination. We have the testimony of Vincent. We have the testimony of the sheriff. The sheriff basically substantiates the timeline of what Vincent is saying, but as the defendant pointed out, the sheriff cannot say what happened with the gate or anything like that. That's all on Vincent. And that testimony, there's no reason that that should not be taken as true. The trial court said in its order, we credit the testimony of the police officer. We don't believe the defendant. And the defendant's burden then is to say that that finding was against the manifest way of the evidence. Well, how could it be so unreasonable that the trial court would believe the police officer? Well, perhaps the defendant's testimony would be sufficient to show that. Well, the state would maintain that it wasn't. The defendant was caught, you know, lying on the stand. They said, they asked the defendant, they said, did you ever ask the police to leave your property? How does he answer? He says, well, I told them I had an attorney named so-and-so. And then, you know, on the cross, he's like, well, okay, I didn't have an attorney, but I just said that. And the point is that totally disregards the question, which was, did you ask the police to leave the property? He evaded it. So you could see why the trial court, after listening to the testimony of the defendant and listening to the police officer, might say, you know, I don't think the defendant is being honest here. But regardless, to say that the defendant's testimony, with its inconsistencies like that, was so strong that we now have to doubt whether Vincent was telling the truth or not about this consent to search, just seems like a losing argument. There is the issue of there was no signed consent form. Vincent testified that they don't use the consent form any more often, the signed consent form, than they do. They do not use it any more often than they do. It's just practice. And the defendant does not cite a case law that says a signed consent form was required, but instead seems to argue that the lack of a signed consent form is proof that Vincent and the Southern, the agents of the Southern Illinois Drug Task Force somehow strong-armed him into letting him into the house. But again, this was a factual determination made by the trial court, and the evidence just does not seem to indicate it. Are there any particular questions? I don't. So I don't think we would respect the request that this court confirm or affirm the eviction. Thank you very much, Mr. Miller. Mr. Harris. Your Honor, first I want to get to your point. Mr. Harris, I just want to ask one thing, sir. Okay. Do you believe that the officers were there and were talking legally, or that they had an improper motive? They had an improper – well, we said this was mixed. They certainly – they had a reason, once they had done the flyover and walkthrough, to get a warrant and search the property. That's conceded. That is a proper purpose. That's not my question. Did they have the right to come in and do the knock and talk? No. Okay. That's what I want to know. Okay. And just to follow up, there's two parts to that question. There's a probable cause issue versus this I can enter because it's open to the public. Correct? Correct. Well, the probable cause issue you do concede, but then the question becomes had they been – had they been charged – had your client been charged with the grow on the outside, would they have needed a warrant to do that versus plain view? That's a different issue because they weren't charged with that, correct? Well, he was charged with that, but he didn't – he wasn't convicted of that, and that wasn't litigated. But it's not before us. Right. So then his second question would be, as you framed it, a perfectly probable cause. Correct. Right. Even if you have probable cause, you still have to either have a warrant or an exception, an exigency exception or a public safety exception or something like that. And there is where you argue there was no exception. Correct. Your Honor, Sheriff Everett testified that he saw Detective Vinson and the other individuals approaching the residence, so I assume at the time they were walking up in he saw Mr. McDonald come out of the house. So I assume he was in a place where he was able to watch this happen. Thank you. Opponent talked about the second issue. We're not abandoning the second issue, but I just point out that that's about whether the consent actually took place, as a matter of fact. And we're saying it's manifestly erroneous that he found it. The first issue is about assuming the consent was given, was it invalidated by the impropriety of the entry? Counsel talked a little bit about this fence being makeshift. That's why I cited that William Pick quote a little bit over the top, but it was one of my favorite quotes from law school. But the point of it is, look, you don't have to have billions and a fortress built around your house to have your property rights respected and your privacy rights respected. You know, this guy here, why even have a gate? Why have a fence if your intent is, well, let's just let let the public in? And there's no testimony that he had. I don't want to say I'm trying to think of an animal that's big enough not to fit through a gap, but would still need to be restrained by fence. He's got a giant cows or something. There's no testimony that the fence was there to hold anything in. But what's the fence there for? It's to convey I want you to keep out of my property. Briefly, I want to talk about the last two attenuation factors that I didn't get to, or maybe it was three. The presence of intervening circumstances between the entry and the consent. We don't have that here. Ordinarily, when you think of that, you think, well, somebody was taken to a polygraph. Somebody was taken before a magistrate. Somebody was saying, let's break for the day and we'll come back tomorrow and continue the interrogation. Nothing like that happens here. The fourth, the purpose of the officer's illegal acts. You know, the purpose here was to conduct a search that was not legal. Like we said, it was perfectly reasonable for them to go get a warrant and think this is something that needs to be investigated. It's not reasonable to say let's just dispense with the warrant. You know, there's no testimony. This would be a different exception. But there's no testimony that he was going to destroy evidence or that he was aware from the police perspective that he was even being investigated. And they didn't give any reason why they couldn't have gotten a warrant. You know, they had evidence. They had six people or five people out there driving around in the scene and stuff who could give an affidavit for a warrant. So, you know, the purpose was improper. And, you know, the flag in the scene also was improper. I kind of hit it with a whimper, not a bang. But if your honors don't have any other questions, we've just asked them before we reversed. Thank you so much. Gentlemen, thank you for your attendance. We're going to take a short recess. But the next case can get ready and we'll be right back with you.